**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JAMES REINDEL,              :
                                    :

           Plaintiff,        :
                                      :

         v.                  :       CIVIL ACTION NO.
                                    :       1:07-CV-3180-JOF

MOBILE CONTENT NETWORK  :
COMPANY, LLC, doing business   :
as The Palestra; and          :
GEORGIA E. WEASEL, III,     :
                                    :

           Defendants.     :

## OPINION AND ORDER

This matter is before the court on Defendant Mobile Content Network Company, LLC's motion for summary judgment [36], Defendant George E. Weasel, III's motion for summary judgment [37], Plaintiff's second motion to compel [65]; and Plaintiff's amended motion to compel [67].

**I.    Background**

**A.    Procedural History and Facts**

Plaintiff, James Reindel, filed suit against Defendants, Mobile Content Network Company, LLC, and George E. Weasel, III, on November 9, 2007, in the Superior Court of Fulton County, alleging causes of action of breach of contract, promissory estoppel, and

fraud. Plaintiff also seeks punitive damages and attorney's fees. Defendants removed the suit to this court on December 21, 2007.

Defendant Mobile Content Network Company, LLC, does business under the name of The Palestra. The Palestra is an Internet and wireless content business designed to create and distribute audio and video information through its website. The content focuses on sports and entertainment news for teenagers and young adults. The content is provided by student reporters on college campuses as well as produced in-house at The Palestra's offices in Columbus, Ohio. Defendant Weasel and John Olvey developed the idea for The Palestra in late 2003 or early 2004. The Palestra was formally organized in 2006, and Weasel and Olvey were the initial members, each owning 50% of the company. At start-up, The Palestra was led by a team of seven key managers who did not receive monetary compensation. Instead, the key managers were offered 200,000 shares of stock in The Palestra.

Plaintiff Reindel has known Defendant Weasel since he was five years old and Weasel was his babysitter. Reindel has worked in the field of writing, producing, and editing news and sports-related productions since 1992 and has an extensive network of contacts at a variety of news and media organizations. Reindel and Weasel had talked about working together as early as 2000. Reindel began working as a full-time freelancer with

2

Turner Broadcasting in the spring of 2006. Prior to that job, Reindel worked as a field producer for CNN en Espanol.

In 2006, Weasel approached Reindel with the idea of The Palestra. Weasel believed that Reindel's background at CNN made him a good candidate to be a member of The Palestra's management team. In October 2006, the discussions between Weasel and Reindel continued and intensified. At that time, Weasel told Reindel that he was keeping his partner Olvey apprised of their conversations "in hopes that it might expedite the process a little." In November 2006, at its own expense, The Palestra flew Reindel to Columbus, Ohio so that Reindel could see operations there. Reindel met Olvey and received a DVD with samples of The Palestra's content.

On November 28, 2006, Weasel flew to Atlanta to try to procure press credentials so that The Palestra's student reporters could have access to various college bowl games. Weasel asked Reindel to assist him in these efforts, and Reindel recommended that Weasel contact Sandy Malcolm who worked for CNN.com. Reindel walked around with Weasel at the offices of Turner and CNN and introduced Weasel to several people. Neither had scheduled meetings with anyone on that visit. Reindel introduced Weasel to Lila Eidi, a producer at CNN.com. The two spoke generally of The Palestra's content, including the Gig Guide, a daily report produced by The Palestra reporting on bands playing around the

country. Eidi expressed interest in getting the Gig Guide on CNN.com, but she was not the person who made content decisions.

Weasel returned to Atlanta on December 20, 2006, where he and Reindel met with Jim Walton, President of CNN. Reindel arranged the meeting after catching Walton in the hallways at CNN. Reindel and Weasel discussed the concept of The Palestra's business with Walton and how CNN would benefit from the use of The Palestra's content. Walton instructed Weasel and Reindel to meet with David Payne, the head of CNN.com and the individual with decision-making authority on the website's content.

The parties dispute why Payne agreed to meet with Reindel and Weasel. Reindel testified that Payne did not know who he was prior to the meeting. *See* Reindel Depo., at 61-62. Payne testified that he "knew [Reindel] as an ex-employee of CNN-Espanol and as a freelance producer for Turner Sports on NASCAR.com. I agreed to host a meeting with [Reindel] to review the business and determine if there might be potential for business development with the Palestra." *See* Payne Aff., ¶ 5. "Prior to our meeting, [Reindel] had met with Lila Eidi, a producer, who was interested in content produced by the Palestra for CNN.com's video service. Based on this fact and [Reindel's] work for Turner, I decided to meet with Mr. Reindel and Mr. Weasel representing the Palestra." *Id.*, ¶ 7.

The parties also dispute whether Reindel made any demands of Weasel or The Palestra before going in to the meeting with Payne. Reindel testified that prior to the Payne

meeting, Reindel requested that he receive five percent of the stock of The Palestra in exchange for getting Weasel to Payne who was the decision-maker for CNN.com and could get The Palestra's content on CNN.com. *See* Reindel Depo., at 75, 80, and 102. Reindel testified that after he and Weasel met with Walton in December 2006, Reindel had a telephone conversation with Weasel in which Reindel said that before he would go ahead with the meeting with Payne, Reindel would need five percent ownership – or 500,000 shares – of The Palestra. Reindel also testified that Weasel said "okay" to this demand. Further, after the meeting with Payne in early January 2007, Reindel testified that when he took Weasel to the airport, Weasel said he was "getting on th[e] plane knowing that [Reindel] ha[d] 5 percent of this company."

Weasel testified that he never promised Reindel a five percent stake in the company, and Reindel did not make any demands of Weasel or The Palestra prior to the Payne meeting. *See* Weasel Depo., at 72. When asked about whether Weasel would have promised five percent of the company to Reindel, Olvey testified, "Yeah, he might have mentioned that. It didn't jive with me, though, because we had four other guys that were only getting 2 percent and they had already spent two years working."

In any event, in early January 2007, Weasel returned to Atlanta and he and Reindel met with Payne. At the end of the meeting Payne said that Eidi could feature the Gig Guide

on CNN's website if she wanted to. In late January 2007, CNN.com began featuring Gig Guide on its website, but did not pay The Palestra for the use of the content.[1]

Reindel testified that on the way to the airport after the meeting with Payne, Weasel confessed to Reindel that Weasel did not have the stock to meet the 500,000 shares that he had promised to Reindel before the meeting with Payne. *See* Reindel Depo., at 77. Reindel further testified that Weasel told him he would get the 500,000 shares even if they had to come out of Weasel's own allocation. *Id.* at 178. Weasel denies this conversation ever took place. *See* Weasel Depo., at 82-83. Reindel testified that at this point, he still had the power to stop CNN.com from placing content from The Palestra on its website. *See* Reindel Depo., at 93.

On January 29, 2007, around the time the Gig Guide was to appear on CNN.com, Weasel wrote Reindel an e-mail stating, "I probably watch out for you – and will watch out for you more than anyone else in this company – including my partner." *See* Weasel Depo., Exh. 15. Reindel testified that he did not block the placement of the Gig Guide content on CNN.com because he believed Weasel would take care of him like family. *See* Reindel Depo., at 219.

---

[1]In August 2007, The Palestra cancelled its agreement to share the Gig Guide with CNN.com when it became clear The Palestra would never receive any revenue from the arrangement.

AO 72A
(Rev.8/82)

On January 28, 2007, Weasel sent an e-mail to Reindel asking Reindel to outline what Reindel wanted to earn and what he thought was fair. Weasel also told Reindel that he would take Reindel's proposal to Olvey and they would "take it from there." Reindel responded by writing: "Let me chew on this and give me a couple of days to work on a sliding scale that will work for the both of us." The e-mail starts off a series of back and forths between Reindel and Weasel in an attempt to settle on a compensation package for Reindel.

On February 5, 2007, Reindel sent an e-mail to Weasel with a proposal for $72,000 salary and 500,000 shares. His proposal also included a sliding scale that provided for an increase in salary and equity as revenues increased. Weasel forwarded this e-mail to The Palestra's comptroller, telling her it was a "starting point" and asking her to take a "long look" at it. It is Reindel's position that this proposal incorporated the fact that Weasel had already promised Reindel 500,000 in stock for the CNN introductions. *See* Reindel Depo., at 117-19 & Exh. 6. Reindel wrote that his proposal would get Reindel to "the million share equity price point." *Id.*

On February 6, 2007, Weasel sent an e-mail to Reindel telling him that Olvey and the comptroller had "major issues" with the proposal and Weasel would have to get back to Reindel. The two continued to exchange e-mails throughout the month of February 2007.

In mid-February 2007, in the midst of these discussions, The Palestra began paying Reindel $3,000 per month consulting fee.

On February 28, 2007, Weasel e-mailed Reindel and stated that The Palestra could offer Reindel one of two compensations plans. Plan A was Reindel acting as a consultant/employee with a fixed monthly payment and an equity stake (which could approach up to five percent depending on revenue). Plan B would have Reindel be a "deal maker" and receive ten percent of the net dollars The Palestra realized as a result of any deal Reindel introduced to The Palestra and also receive up to five percent of the company if certain conditions occurred. Reindel responded to this proposal by stating, "let's consider me as you put in Plan B, a deal maker." Reindel further commented that what was presented was still "significantly vague" and there was not anything to "commit to." Reindel continued to state that he would like a "commitment" from Weasel that Reindel would receive ten percent of any future revenue that would arise from the then-existing CNN relationships that Reindel "had been responsible for Palestra being involved in." He asked Weasel to "write back asap to confirm and commit to this part of [their] relationship." *See* Reindel Depo., Exh. 19.

In early March 2007, The Palestra sent Reindel a subscription agreement for 200,000 shares of stock. Reindel did not return the subscription agreement to The Palestra but signed it and forwarded it to his counsel to review. On March 9, 2007, to try to stop the "trail of

misunderstandings," Weasel sent Reindel a Consulting Agreement and asked him to execute it and return it to The Palestra. Reindel did not sign or return the Agreement. On April 6, 2007, Reindel's counsel wrote to The Palestra stating that Reindel wanted "to reduce to writing his commission agreement for 10% of the gross revenues that arrive through or from CNN-Time Warner/Turner Properties, or any affiliate or subsidiary thereof" and requested that The Palestra execute a signature page attached to the letter and return it. The Palestra did not execute the signature page. The Palestra stopped paying Reindel $3,000 per month at the end of March 2007 because in its view, he was not providing any services. Reindel testified that during this time, he turned down an offer of full-time employment with Turner so that he could continue to stay freelance and help The Palestra.

While the Gig Guide was being featured on CNN.com, Weasel testified that via e-mail Payne introduced Weasel to Ken Jautz, then President of CNN Headline News. Payne suggested that Jautz and Weasel meet to discuss possible projects. Payne did not copy Reindel on this e-mail, but Weasel forwarded his copy of the e-mail to Reindel.

Weasel then met with Joel Cheatwood who at the time was in charge of development for CNN Headline News. Weasel testified that it was Jautz who introduced him to Cheatwood. *See* Weasel Depo., at 85-86. In contrast, Payne testified that he, Payne, introduced Weasel to Cheatwood because he believed Cheatwood, as Executive Director of Program and Talent Development at CNN, "might be interested in further pursuing a

9

relationship with the Palestra on behalf of CNN." *See* Payne Aff., ¶ 8. Reindel has never met Cheatwood.

In April 2007, Weasel read in the paper that Cheatwood was leaving CNN and had accepted a job as Vice-President of Development at FOX News Channel. Weasel called Cheatwood's cell phone to offer his congratulations on the new position. Weasel also e-mailed Cheatwood in April 2007 to say he hoped that there might be opportunities for The Palestra to partner with FOX. In October 2007, after several meetings, FOX purchased exclusive rights to the Gig Guide. To date, no revenue has been generated as a result of this arrangement.

The Palestra cannot issue stock without receiving an executed subscription agreement. Defendants agree that Reindel was offered 200,000 in shares and Weasel believed that Reindel would be a shareholder of The Palestra as a result of this offer. Reindel, however, never returned a signed subscription agreement to The Palestra. He forwarded it to his attorney who did not pass it along further.

### B.    Contentions

As the basis of his breach of contract claim, Reindel asserts that Weasel promised him 500,000 shares of The Palestra for introducing Weasel to various CNN contacts. Reindel argues that this verbal contract was separate from any other discussions the two had

about bringing Reindel in to The Palestra as an employee and any compensation he would receive in that role.

Defendants flat out dispute that Weasel ever promised Reindel 500,000 shares of the company for any reason, including merely for introducing Weasel to CNN contacts. Even if Weasel had made such a promise, Defendants argue that Reindel's breach of contract claim fails because Weasel did not have the authority to enter into such a contract on behalf of The Palestra, there was no mutual assent to the terms of any contract to give shares of The Palestra to Reindel, and there was not adequate consideration to support any contract to pay Reindel in shares for the introductions he provided. Defendants agree that Weasel offered to bring Reindel in as a "key manager" at 200,000 shares and Defendants attempted to deliver the 200,000 shares to Reindel, but although he sent a check to the company for $200, he refused to sign the subscription agreement and the shares were never given over to him.

Defendants posit that the innumerable e-mail and telephonic contacts between Weasel and Reindel that occurred throughout the spring of 2007 were attempts to complete negotiations of a compensation agreement but that the parties were never able to reach mutual assent on terms. Defendants argue that no contract was reached with respect to any employment agreement because Reindel never accepted either the Plan A or Plan B option, and even if he had, his response to the Plan B offer was not an acceptance but rather a counteroffer because Reindel wanted a "commission" of ten percent of the gross revenues

11

of any deal he initiated, as opposed to ten percent of the net revenues. Reindel responds that he accepted the Plan B option in an e-mail to Weasel and is therefore entitled to ten percent of the gross revenues of any deal The Palestra has with FOX.

Defendants argue that Reindel's promissory estoppel claim fails because Reindel cannot establish that he reasonably relied on Weasel's alleged promise to give him 500,000 shares of The Palestra's stock. Defendants also contend that the promise for the 500,000 shares was not sufficiently definite to form the basis for a promissory estoppel claim. Reindel responds that he reasonably believed Weasel's promise of 500,000 shares because Weasel was a close family friend and Weasel needed Reindel's contacts to further The Palestra's interests. Reindel relied on this promise and introduced Weasel to additional contacts at CNN and Turner.

Defendants aver that Reindel's fraud claim fails because any promise relating to the five percent stock ownership was unenforceable at the time it was made. Defendants further assert that Reindel cannot show that any statements were made with the intent to deceive at the time they were made by Weasel. Finally, Defendants contend that Reindel cannot demonstrate reliance on the statements made by Weasel. Reindel responds that because it is a question for the jury as to whether the promise of five percent of the stock is valid, Defendants' argument that Reindel's fraud claim fails because of an unenforceable contract is without merit. Reindel further asserts that a jury could conclude that Weasel made the

promise with the present intent to deceive because Weasel made the offer even knowing that he could not unilaterally promise the stock, Weasel told other potential investors that Reindel would be a shareholder in hopes of generating additional investment, and Weasel testified in his deposition that he may not have meant that he would take care of Reindel more than he would his own partner.

## II.    Discussion

### A.    Rule 56(f) Motion

In his response to Defendants' motions for summary judgment, Reindel argues that he has not received all of the discovery he is entitled to and asks via Rule 56(f) for a continuance of the motions for summary judgment. "As a general rule summary judgment should not be granted until the party opposing the motion has had an adequate opportunity to conduct discovery." *Reflectone, Inc. v. Farrand Optical Co., Inc.*, 862 F.2d 841, 843 (11th Cir. 1989). The district court is not, however, required to await completion of discovery before ruling on a motion for summary judgment. *See Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.3d 1313, 1316 (11th Cir. 1990). Concerning this balance, the Eleventh Circuit has said, "it would be inappropriate to limit summary judgment to cases where discovery is complete in light of the valuable role served by summary judgment and the commitment of discovery issues to the sound discretion of the trial judge." *Id.* (quoting *Wallace v. Brownell Pontiac-GMC Co., Inc.*, 703 F.2d 525, 528 (11th Cir. 1983).

13

Subsection (f) allows a party who "has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof." *Wallace*, 703 F.2d at 527. Although the Eleventh Circuit has stated on numerous occasions that Rule 56(f) is "infused with a spirit of liberality," *see, e.g.*, *Reflectone*, 862 F.2d at 844, the party seeking the continuance clearly cannot rest upon "vague assertions that additional discovery will produce needed, but unspecified, facts." *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980). A party requesting a Rule 56(f) continuance is required to "present an affidavit containing specific facts explaining his failure to respond to the adverse party's motion for summary judgment via counter affidavits establishing genuine issues of material fact for trial." *See Barfield v. Brierton*, 883 F.2d 923, 931 (11th Cir. 1989).

Here, Reindel contends that Defendants have not provided him with discovery related to The Palestra's contractual relationship with FOX. The parties stipulated on a withdrawal of Reindel's first motion to compel concerning the FOX documents. However, Reindel later filed a second motion to compel regarding the documents. The court finds that even if Defendants have not provided discoverable information about the FOX relationship, that discovery clearly goes to the amount of damages. Defendants' motions for summary judgment do not rest on any contentions with respect to damages, but rather address whether

14

the parties ever entered into a contract. Thus, any failure of evidence on the FOX contract would not hamper Reindel in responding to Defendants' motions for summary judgment.

Further, as the court stated above, a party seeking a continuance under Rule 56(f) must provide an affidavit of the attorney setting forth specific evidence the party lacks and how that evidence renders the party unable to respond to a motion for summary judgment. Here, Reindel's attorney filed an affidavit stating that he was attempting to obtain the affidavit of a former employee of The Palestra which would "contain statements that relate to representations made concerning Mr. Reindel's involvement with The Palestra that are material to Plaintiff's case." *See* Berney Aff., ¶ 3. The court finds that this vague statement does not meet the specificity required by Rule 56(f).

Thus, the court finds that Reindel has not set forth sufficient reason to continue Defendants' motions and provide him time to procure additional discovery.

## B.     Breach of Contract

The court notes that Defendants The Palestra and Weasel filed separate motions for summary judgment as to Reindel's claims. It is difficult to discern from Reindel's complaint which claims he brings against Weasel individually and which he brings against Weasel acting in his capacity as an officer of The Palestra. The counts in the complaint do not specify defendant. In response to Defendants' Statement of Material Fact ¶ 55, Reindel states, "Defendant Weasel made himself a party to the agreement by personally guaranteeing

15

the obligations of the Palestra." *Id.* It is not clear to the court precisely what this means. In any event, because the court finds below that none of Reindel's substantive claims survive, the court refers to "Defendants" collectively for the ease of reading.

For the purposes of this discussion, the court will assume that Reindel is correct that the parties attempted to enter into two separate agreements: (1) to compensate Reindel for the CNN introductions and getting Palestra content on to the CNN.com website and (2) an employment agreement with The Palestra. The court makes this assumption because on a motion for summary judgment, it must draw all inferences in favor of the non-moving party. Defendants have proffered no evidentiary reason why Reindel cannot argue the existence of two separate contracts, and reading the chronology of facts while drawing inferences in favor of Reindel could allow a reasonable jury to conclude the existence of two separate contracts. The court considers each in turn.

To establish a breach of contract claim, a plaintiff must show (1) an enforceable agreement, (2) breach of that agreement, and (3) damages as a result of that breach. *See*, *e.g.*, *Broughton v. Johnson*, 247 Ga. App. 819, 819 (2001). Under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1.

16

Reindel argues that prior to the meeting with Payne, he requested 500,000 in shares of The Palestra. Reindel testified that this promise was made during a telephone conversation between Reindel and Weasel, after the two had met with Walton in December 2006. During that conversation, Reindel told Weasel that before he would go ahead with the meeting with Payne, Reindel would need five percent ownership – or 500,000 shares – of The Palestra. Reindel also testified that Weasel said "okay" to this demand. Thus, Reindel argues that the consideration The Palestra paid for Reindel agreeing to go in to the meeting with Payne and support The Palestra was 500,000 shares.

Defendants argue that this promise cannot form the basis of a contract because (1) Weasel lacked the authority to enter into such a contract on behalf of The Palestra; (2) even if Weasel had the authority, there was no mutual assent to terms; and (3) there was no adequate consideration for the promise. There are three types of agency relationships under Georgia law: express, implied, and arising though subsequent ratification by the principal of the agent's conduct. *See* O.C.G.A. § 10-6-1. The parties here focus on an implied agency relationship.[2] "Apparent authority is that which the principal's conduct leads a third party reasonably to believe the agent has; it creates an estoppel allowing third parties to bind a principal to the agent's acts on account of the principal's conduct, reasonably construed by

---

[2]The court notes that Reindel has proffered no evidence to controvert Defendants' assertion that Weasel did not have express authority to offer Reindel 500,000 shares of The Palestra.

17

third parties acting in innocent reliance thereon." *Bresnahan v. Lighthouse Mission, Inc.*, 230 Ga. App. 389 (1998) (citations and quotations omitted).

In *Hinely v. Barrow*, 169 Ga. App. 529 (Ga. App. 1984), the court explained the manner in which an implied agency relationship may be shown.

> Agency may result where one party has apparent authority to affect the legal relations of another party by transactions with a third party, but it must be emphasized that apparent authority to do an act is created as to a third person when the statements or conduct of the alleged principal reasonably cause the third person to believe that the principal consents to have the act done on his behalf by the purported agent.

*Id.* at 530. The court continued to state:

> [W]here the only evidence that a person is an agent of another party is the mere assumption that such agency existed, or an inference drawn from the actions of that person that he was an agent of another party, such evidence has no probative value and is insufficient to authorize a finding that such an agency exists.

*Id.*

Reindel argues that the mere fact of Weasel's position as part owner of The Palestra cloaked him with apparent authority to contract on behalf of The Palestra. That is to say that Weasel's actions were the demonstration of the principal consenting to Weasel's own agency. As Defendants point out, however, Reindel does not cite to any case law which supports his theory that a part owner of a company always acts with apparent authority by virtue of his position. Case law discussing theories of agency with respect to a chief executive officer of a corporation is instructive. In *Bresnahan*, the court specifically

rejected an argument that the president of a corporation "necessarily had apparent authority to enter into [an] agreement." 230 Ga. App. at 391. The court noted that a "president of a corporation does not, by virtue of his office alone, have authority to contract in its behalf, although being the alter ego of the corporation, he may be presumed to have power to act for it in matters within the scope of its ordinary business." *Id.* (quotation and citations omitted).

Not every transaction is ordinary and the court must consider whether a reasonable person could believe the agent had authority under the circumstances. "For a third party to estop the principal from denying its agent's apparent authority, it must appear that 'a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such an agent had authority to perform a particular act and deals with the agent upon that assumption.'" *See Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc.*, 44 F. Supp. 2d 1348, 1355 (N.D. Ga. 1998) (Thrash, J.) (quoting *Addley v. Beizer*, 205 Ga. App. 714, 720 (1992), and noting that a low level employee could not reasonably be viewed as having authority to enter into a contract).

The transfer of shares of the corporation is not considered "ordinary" business. *See Nunez Gin & Warehouse Co. v. Moore*, 10 Ga. App. 350 (1912) ("Where a gin and warehouse company holds out a person as its general manager, the title implies power to make any contracts ordinarily necessary for the conduct of its business. Authority to

19

execute a promissory note for the purchase of an engine and boiler, and to bind the corporation for its payment, would be presumed to be within the scope of the general manager's authority. But neither the general manager nor any other officer of a corporation has power or authority to purchase its capital stock, and to bind the corporation for the payment therefor by promissory note or otherwise.").

In *Dragon Corp. v. Syphers*, 85 Ga. App. 781 (1952), the plaintiff filed suit against the Dragon Corporation to recover on an alleged oral promise. Syphers alleged that he was one of several shareholders that owned a boat the Dragon Corporation wished to purchase. In order to induce Syphers to agree to sell the boat, Syphers contended that the Dragon Corporation, through its president, Sidney Bottenfield, promised Syphers a job paying $50 per week so long as the Dragon Corporation was in business. The court stated:

> It is here alleged that Bottenfield is a stockholder in and president of the corporation, but it is nowhere alleged that he is the agent of the corporation or was its duly authorized agent for the purpose of making such a contract with the plaintiff. Neither is it alleged that either as stockholder or president he had authority to bind the corporation by contract generally, or by an oral contract which would obligate the defendant so long as it should continue in business. The president of a corporation, merely in virtue of being such, has no power to bind the company by a contract. *Hale-Georgia Minerals Corp. v. Hale*, 83 Ga. App. 561. In consequence, a contract entered into by the president of a corporation in its behalf is not binding upon the corporation unless (1) the charter or bylaws give the president such authority, or (2) the authority may be inferred from a course of dealing, or (3) the corporation ratifies his acts. *Potts-Thompson Liquor Co. v. Potts*, 135 Ga. 451, 460.

AO 72A
(Rev.8/82)

*Id.* at 783. Although *Dragon Corp.* is decided on pleading allegations, the references made by the court confirm that apparent authority is not automatic in the context of a corporate officer.

Reindel asserts that Weasel promised him five percent of the stock of The Palestra, clearly not an ordinary transaction. The court finds that even Weasel's position as a part owner and officer of the company cannot render his offer of stock to have been made with apparent authority. Distribution of stock is not an ordinary transaction along the lines of rental of office space or even contracting with a client. It is an event at the highest level of corporate structure. Therefore, the court finds that no reasonable jury could conclude that Weasel had the apparent authority to enter into a contract to bind The Palestra.

Reindel's assertions concerning an employment contract can be disposed of more quickly. Reindel argues that he accepted The Palestra's offer of an employment contract when he sent Weasel an e-mail stating, "let's consider me as you put in Plan B, a deal maker." However, in that same communication to Weasel, Reindel states that he would like a "commitment" from Weasel that Reindel would receive ten percent of any future revenue that would arise from the then-existing CNN relationships that Reindel "had been responsible for Palestra being involved in." He asked Weasel to "write back asap to confirm and commit to this part of [their] relationship." *See* Reindel Depo., Exh. 19. This latter portion of Reindel's communication renders it a counteroffer. The "Plan B" offered by The

Palestra to Reindel stated that he would receive ten percent of net revenues. Reindel responds that he would like ten percent of any revenue – or gross revenue. This difference in terms makes it clear that the parties had not reached mutual assent as to terms, and Reindel's e-mail was a counteroffer that was never accepted by The Palestra.

Reindel argues that Defendants should be estopped from denying the existence of a contract because Defendants paid Reindel a salary of $3,000 per month for a number of months and therefore both parties acted as if a valid contract was in place. The court finds this argument unpersuasive. Reindel asserts that he accepted the Plan B proposed compensation plan. This plan did not contemplate any fixed salary, although Plan A did. Thus, the fact that Defendants briefly paid Reindel a fixed salary does not indicate that Defendants were acting as if the parties had reached agreement on Plan B.

Therefore, Reindel cannot establish a breach of contract claim with respect to the "Plan B" employment offer. The court GRANTS Defendants' motion for summary judgment with respect to Reindel's breach of contract claims.

### C.    Promissory Estoppel

The parties agree that Reindel's promissory estoppel and fraud claims relate only to the alleged verbal contract to give Reindel five percent of The Palestra's stock in exchange for the introduction to CNN personnel. The fact that the court granted summary judgment in favor of Defendants with respect to the breach of contract claim does not automatically

22

preclude Reindel's promissory estoppel claim. *See, e.g., 20/20 Vision Center v. Hudgens*, 256 Ga. 129, 134-35 (1986); *Hendon Properties, LLC v. Cinema Development, LLC*, 275 Ga. App. 434, 439 (2005); *Pabian Outdoor-Aiken, Inc. v. Dockery*, 253 Ga. App. 729, 731 (2002); *DPLM, Ltd. v. J.H. Harvey Co.*, 241 Ga. App. 219 (1999).

"Under the Georgia action for promissory estoppel, the essential elements are that: (1) the defendant made a certain promise or promises; (2) the defendant should have reasonably expected the plaintiff to rely on such promise or promises; (3) plaintiff did, in fact, rely on such promise or promises to his detriment; and (4) an injustice can be avoided only by the enforcement of the promise, because the plaintiff surrendered, forgoes, or rendered a valuable right." *Simpson Consulting, Inc. v. Barclays Bank PLC*, 227 Ga. App. 648, 656 (1997), *overruled on other grounds*, *Williams General Corp. v. Stone*, 279 Ga. 428 (2005); O.C.G.A. § 13-3- 44(a). Promissory estoppel is an equitable doctrine, and as such requires reasonable reliance on a promise, meaning that "the plaintiff relied exclusively on such promise and not on his or her own preconceived intent or knowledge; that the plaintiff exercised due diligence, so as to justify such reliance as a matter of equity; and that there was nothing under the circumstances which would prevent the plaintiff from relying to his detriment." *Simpson Consulting*, 227 Ga. App. at 657.

The court agrees with Reindel that his testimony about the promise is sufficiently definite to form the basis of a "promise" under a theory of promissory estoppel. Reindel

testified that Weasel promised him 500,000 shares of The Palestra if Reindel introduced him to Reindel's connections. There is nothing vague or uncertain about those obligations.

With respect to detrimental reliance, a plaintiff must show that he changed his position to his detriment "by surrendering, forgoing, or rendering a valuable right." *See*, *e.g.*, *Sierra Craft, Inc. v. T.D. Farrell Construction, Inc.*, 282 Ga. App. 377, 382 (2006) (quotation and citation omitted); *Clark v. Byrd*, 254 Ga. App. 826, (2002) ("Detrimental reliance which causes a substantial change in position will constitute sufficient consideration to support promissory estoppel."). Here, Reindel testified that he decided not to accept an offer of full-time employment with Turner because he wanted to keep his time flexible to assist The Palestra. He also stated that he continued to search for business partnerships for The Palestra and housed certain student reporters for The Palestra at his home. Finally, Reindel testified that he allowed the meeting with Payne to go forward because Weasel promised him 500,000 shares. It is not clear that these acts would constitute a "substantial change in position." In any event, the court need not resolve this issue because it finds below at any reliance by Reindel was not reasonable.

However, the court finds that Reindel's reliance on Weasel's alleged promise was not reasonable for the same reasons the court found that Reindel could not rely on a theory of apparent authority to establish his breach of contract claim. The Eleventh Circuit has held in the promissory estoppel context that it "usually is unreasonable to rely on a substantial

24

promise that has not been reduced to writing." *Johnson v. University Health Services, Inc.*, 161 F.3d 1334, 1340 (11ᵗʰ Cir. 1998) (citing *R.T. Patterson Funeral Home, Inc. v. Head*, 215 Ga. App. 578 (1994)). In *Johnson*, the court held that it was not reasonable for the physician plaintiff to rely on verbal discussions with relatively low-level officials who allegedly promised a $1 million aid package to set up her own practice. *Id.* at 1341; *see also Fidelity & Deposit Co. of Maryland v. West Point Constr. Co.*, 178 Ga. App. 578, 580 (1986) ("there could be no reasonable reliance on [the promise] because its enforceability is fraught with legal impediments").

Reindel testified that he was of great value to The Palestra because of his seventeen years' experience in the sports and entertainment media field. Such years of experience would presume a certain degree of business savvy. As the court explained above, the promise of five percent of a company's stock is an extraordinary transaction. No jury could conclude that it was reasonable for Reindel to rely on Weasel's statement at the airport that he would get Reindel five percent of the company's stock. The fact that Weasel had known Reindel since Reindel was a toddler does not make Reindel's reliance any more reasonable.

For the foregoing reasons, the court GRANTS Defendants' motion for summary judgment on Plaintiff's promissory estoppel claim.

AO 72A
(Rev.8/82)

**D.      Fraud**

Under Georgia law, a fraud claim is not actionable if the promise underlying the claim was unenforceable at the time it was made.  In *Balmer v. Elan Corp.*, 278 Ga. 227 (2004), the employer made an oral promise not to discharge or adversely treat at-will employees if they provided truthful information to the Food & Drug Administration during an inspection of the employer's facility.  After being terminated, several former employees filed a complaint alleging breach of contract, promissory estoppel, fraud, defamation, and violation of whistle-blower laws.  The court found that the plaintiffs' breach of contract claim was without merit because oral promises are not enforceable by at-will employees. *Id.* at 228-29.  The court then held that because the promise upon which the plaintiffs based their fraud claim was unenforceable, the fraud claim also failed.  *Id.* at 230 (citing *Johnson v. MARTA*, 207 Ga. App. 869, 870 (1993), and *Cannon v. Geneva Wheel & Stamping Corp.*, 172 Ga. App. 20 (1984)).  *See also Pelletier v. Stuart-James Co.*, 863 F.2d 1550, 1555 (11th Cir. 1989) (applying Georgia law) ("Where a contract is unenforceable, an action for damages cannot be maintained on the ground of fraud in refusing to perform the contract, even though the promisor at the time of making the oral contract may have had no intention of performing it."); *Dennis v. First National Bank of the South*, 293 Ga. App. 890, 895 (2008) (there can be "no justifiable reliance on a promise which is unenforceable at the time

it is made"); *Adamson v. Maddox*, 111 Ga. App. 533, 536 (1965) ("It is contrary to common sense to rely upon a promise that is not legally binding upon the person making it.").

Therefore, the court GRANTS Defendants' motion for summary judgment as to Reindel's fraud claim.[3]

## III.    Conclusion

The court GRANTS Defendant Mobile Content Network Company, LLC's motion for summary judgment [36]; GRANTS Defendant George E. Weasel III's motion for summary judgment [37]; DENIES AS MOOT Plaintiff's second motion to compel [65]; and DENIES AS MOOT Plaintiff's amended motion to compel [67].

**IT IS SO ORDERED** this 17th day of August 2009.


              /s J. Owen Forrester
              J. OWEN FORRESTER
         SENIOR UNITED STATES DISTRICT JUDGE

---

[3]Because the court has granted Defendants' motion for summary judgment as to all of Reindel's claims, the court need not address the issues of punitive damages and attorney's fees, or Plaintiff's second and amended motions to compel.

AO 72A
(Rev.8/82)